IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

JUSTIN GARNER                                                                                         PLAINTIFF

v.                                          Case No. 4:22-cv-4032

JBS LIVE PORK LLC                                                                                DEFENDANT

## MEMORANDUM OPINION and ORDER

Before the Court is Defendant's Motion for Summary Judgment. ECF No. 27. Plaintiff has responded to the motion. ECF No. 28. Defendant has filed a reply. ECF No. 29. The Court finds this matter ripe for consideration.

## I.   BACKGROUND

In 2017, Plaintiff Justin Garner expressed to representatives of Defendant JBS Live Pork, LLC ("JBS") his interest in purchasing a hog farm ("Farm") located in Howard County, Arkansas. To secure financing for the Farm, Garner worked with Cindy Looney[1] from JBS to obtain a letter of intent, titled "Letter Agreement," which was signed on December 6, 2017. ECF No. 27-10. Under the Letter Agreement, JBS and Garner expressed their mutual intent to enter into a five-year sow production agreement. The letter of intent included a draft sow production agreement for Garner's review. Garner closed on the Farm in March 2018. On March 15, 2018, Garner and JBS entered into the Sow Production Agreement ("Agreement") (ECF No. 27-2), which was identical to the draft agreement included in the letter of intent.

The Agreement's effective period was from March 15, 2018, through March 14, 2023. Generally, Garner agreed to raise and breed JBS's pigs according to the terms and conditions of

---

[1] Cindy Looney is a Production Manager with JBS and is responsible for the oversight of operations on approximately thirty-five (35) sow farms in Arkansas and Oklahoma. She oversaw the operations on Garner's Farm.

the Agreement. In exchange, JBS agreed to compensate Garner on a per-piglet basis. Some of the relevant terms of the Agreement are as follows.

Garner would be in default if he "fail[ed] to properly care for the pigs." ECF No. 27-2, at § VII(1)(b). Garner would be in default if he "fail[ed] to properly manage and dispose of manure, waste, or dead pigs according to the terms of [the] Agreement." ECF No. 27-2, at § VII(1)(e). Garner would be in default if he "fail[ed] to meet [JBS's] performance standards for sow productivity, mortality, medication, feed usage, pig quality, or cost-per-pig specifications . . . ." ECF No. 27-2, at § VII(1)(f). Garner would be in default if he breached any "material provision of [the] Agreement." ECF No. 27-2 § at VII(1)(h). JBS was entitled to terminate the agreement if Plaintiff did not cure a default within thirty (30) days after receiving notice of the default. ECF No. 27-2, at § VII(3)(a).

JBS was required to pay Garner $14.50 per pig that met JBS's weaned pig specifications. ECF No. 27-2, at § III(1). The weaned pig specifications were included as an addendum to the Agreement and listed numerous criteria that each piglet must meet to receive full payment from JBS. ECF No. 27-2, at 31-32. One such criterion is that the pig must not show signs of "unthriftiness/longhair." ECF No. 27-2, at 31. The term "unthriftiness" was not defined in the Agreement. The pig specifications addendum stated that the decision by a JBS representative regarding Garner's "adherence to the specifications will be final" and that the "specifications may be modified periodically by [JBS] in its sole discretion." ECF No. 27-2, at 31. In February 2021, JBS sent amended pig specifications, which added that JBS would reduce pay to Garner by $5 for each pig weighing between six and eight pounds. ECF No. 27-4, at 1.

The Agreement required JBS to deliver to Plaintiff's Farm "a quantity of Breeding Stock consisting of approximately five hundred seventy-five (575) gilts and sows." ECF No. 27-2, at

§ II(1). However, the Agreement expressly granted to JBS "the right to limit gilt replacement . . . ." ECF No. 27-2, at § IV(A)(4). According to Garner, JBS had problems with determining an accurate inventory for the hogs at the Farm, and there were instances where the Farm's breeding stock was below 575 gilts and sows. In September 2021, JBS did not deliver gilts to its contract hog farmers, including Garner, because the herd was diagnosed with an infectious disease.

Before shipping a batch of pigs to JBS, Garner would count the pigs to be transferred and report that number to JBS. Garner and a JBS representative would inspect these pigs. One such representative, Robert Todd Matthews, would tell Garner if he saw any pigs that were "unthrify," lame, or needed to be euthanized. Prior to departure, Garner and the truck driver would create a voucher stating the number of pigs being shipped. The pigs would be driven to a JBS facility approximately eleven to fourteen hours away. During the trip, it would be possible for a pig to become lame or fall off the truck. Upon arrival, the pigs would be sorted into crates. Within 72 hours, a JBS-employed field manager would inspect and count the pigs, noting any conformance issues requiring less than full pay. Garner would receive a form titled "Batch Farrowing Request for Final Payment" after every batch of pigs he shipped to JBS, and this form would note the number of pigs that failed to conform to JBS's requirements. Garner claims he was not provided with any evidence to demonstrate which, or how many, piglets did not conform to standards, and he complained to JBS about their practice of docking his payments based on failure to meet specifications.

JBS sent Garner three contractual notices of default, in March 2020, July 2020, and August 2021. Because of perceived difficulties with Farm operations, Looney assigned JBS employee Jason Henson to assist on Garner's Farm. Henson attended Garner's Farm once a week for several months in the Fall of 2020. Garner remedied the alleged problems identified in the July 2020

3

notice of default. In June 2021, Matthews noted that Garner's pigs "overall look[ed] really good." ECF No. 28-6, at 18. Garner remedied the alleged problems identified in the August 2021 notices of default. However, in September 2021, the Farm failed a JBS animal welfare audit. In October 2021, Matthews claimed that pigs on the Farm were left without access to adequate water. ECF No. 27-5, at 25. Also in 2021, JBS made the business decision that going forward, it would not issue contracts on older, smaller pig farms. ECF No. 27-5, at 53.

At some time after the failed animal welfare audit, Looney recommended that JBS terminate the Agreement based on the continuing nature of welfare issues, Garner's absence from the Farm, production issues, and reporting issues. JBS terminated the Agreement on November 8, 2021, and removed its pigs from the Farm. Garner's Farm had 498 breeding pigs when JBS removed the herd.

After JBS terminated the Agreement, Garner began efforts to sell the Farm, but the Farm was never listed for sale. When asked, a JBS representative told prospective purchasers that JBS would not provide a contract to them if they purchased the Farm.

On April 5, 2023, Garner filed his complaint against JBS, alleging four claims for relief: breach of contract, estoppel, tortious interference, and conversion. JBS has asserted a counterclaim against Garner for breach of contract. In the instant motion (ECF No. 27), JBS argues that it is entitled to summary judgment on all claims. Garner disagrees.

## II. LEGAL STANDARD

"Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quotation omitted). A fact is material only when its resolution affects the

outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id*. at 252. "There is no genuine issue of material fact when the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Zimmerli v. City of Kansas City, Missouri*, 996 F.3d 857, 862-63 (8th Cir. 2021) (quotation omitted).

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). "The party moving for summary judgment generally has the burden of demonstrating the absence of any genuine issues of material fact." *Zimmerli*, 996 F.3d at 863. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256.

### III. DISCUSSION

The Court will proceed by separately addressing each of Garner's claims and JBS's corresponding arguments as to why it is entitled to summary judgment.

**A. Breach of Contract**

Plaintiff alleges that JBS breached the Agreement by failing to provide him with an appropriate number of gilts and sows, failing to properly provide him with replacement breeding stock, failing to pay him for the pigs transferred from his farm, and terminating the Agreement.

The elements of a common law breach of contract claim in Arkansas are: (1) the existence of a contract; (2) an obligation on the part of the defendant under the contract; (3) a failure to perform the obligation; and (4) resulting damages. *Barrows/Thompson, LLC v. HB Ven II, LP*, 599 S.W.3d 637, 647 (Ark. App. 2020). Here, neither party disputes the existence and validity of

the Agreement.

### 1. Failure to Provide an Appropriate Number of Gilts and Sows

Under the Agreement, JBS was obligated to "deliver or cause to be delivered to [Garner's Farm] a quantity of Breeding Stock consisting of approximately <u>five hundred seventy-five, (575)</u> gilts and sows." ECF No. 27-2, at § II(2). However, the Agreement expressly granted to JBS "the right to limit gilt replacement . . . ." ECF No. 27-2, at §IV(A)(4). When reading both provisions together, JBS had the right to limit gilt deliveries so long as Garner's breeding stock consisted of approximately 575 gilts and sows. Garner argues that JBS breached its duty to provide his Farm with approximately 575 gilts and sows.

To support his claim, Garner cites to testimony from Matthews stating that he guessed Garner averaged 550 sows and gilts on his Farm. ECF No. 28-6, at 22. Garner also cites to Matthews's testimony that Garner once called in an inventory count of only 516 gilts and sows at his Farm and testimony from Looney stating that one year the breed herder census count was 545. Garner also relies on Looney's testimony that there were 498 breeding animals on Garner's Farm when JBS canceled the Agreement. Thus, there is evidence in the record to support Garner's claim that JBS breached its contractual duty to provide him with the required number of gilts and sows.

When asked in his deposition if he consistently had approximately 575 gilts and sows at the farm, Garner replied that "[i]t was always around that—that number, yes." ECF No. 273, at 24. The Court is confused by Garner's admission that his breeding stock was always around 575, given the claims in his complaint. The Court also finds troubling Garner's failure to address this admission in his summary judgment response. However, the Court must be careful not to weigh the evidence or assign credibility at this stage. The numbers cited by Looney and Matthews come from JBS's records, with the understanding that the inventory count of 516 was self-reported by

Garner. Although this is an unusual situation, there does not appear to be a sham issue introduced by the conflict in these numbers, as Garner is not attempting to introduce an affidavit to contradict his previous testimony or to contradict the previous testimony by Matthews and Looney.

Summary judgment is permitted only when there is no genuine issue of material fact. Whether JBS fulfilled its contractual duty to ensure Garner's Farm contained approximately 575 gilts and sows is a significant and genuine issue of material fact that defeats JBS's motion for summary judgment.

### 2. Failure to Properly Provide Replacement Breeding Stock

The only contractual duty regarding gilt deliveries is found in the provision discussed above, which obligated JBS to deliver to the Farm a quantity of breeding stock consisting of approximately 575 gilts and sows. The Agreement also granted JBS the right to limit gilt replacement. ECF No. 27-2, at §IV(A)(4). Thus, as stated above, JBS had the right to limit gilt deliveries so long as Plaintiff's breeding stock consisted of approximately 575 gilts and sows.

Garner argues that JBS failed to properly provide him with replacement breeding stock. To support his argument, he cites to two separate instances. In September 2021, JBS failed to provide Garner with replacement gilts. JBS made that decision to protect Garner's breeding stock from a disease outbreak as some of JBS's gilts were diagnosed with an infectious disease at the time. On another occasion, JBS provided replacement breeding stock to Garner, but two gilts were lame upon delivery. Garner asserts that these two instances show that JBS failed to properly provide him with replacement breeding stock.

Under the Agreement, JBS had no contractual duty to deliver a specific number of replacement gilts to Garner's Farm. In fact, the Agreement granted JBS the right to limit gilt replacement. Thus, Garner's argument that JBS failed to properly provide him with replacement

stock is essentially the same argument as above—that JBS breached its duty to provide his Farm with approximately 575 gilts and sows. The Court has already determined that this is a significant and genuine issue of material fact that defeats JBS's motion for summary judgment.

### 3. Failure to Pay for Pigs Transferred from the Farm

The Agreement provided that JBS would pay Garner $14.50 per pig "transferred to a [JBS] designated facility meeting [JBS's] Weaned Pig Specifications." ECF No. 27-2, at § III(1). The Agreement specified that Garner would not receive compensation for any pig not meeting the weaned pig specifications. ECF No. 27-2, at § III(1). In other words, JBS was contractually obligated to pay Garner for pigs received at a JBS facility that complied with the weaned pig specifications. Garner claims that JBS "routinely and systematically failed to pay Garner for the pigs that were 'transferred' from his Farm." ECF No. 28, at 6.

In her deposition, Looney described the process of pig delivery. ECF No. 27-5, at 25, 45-46. When the pigs were weaned and ready to ship to JBS, Garner would count the pigs and report that number to JBS. A few days before the scheduled shipment to JBS, Matthews would inspect the pigs that were to be shipped. The pigs were then loaded on a truck and driven to a JBS facility. Upon arrival, the pigs were sorted into crates. Within 72 hours, a JBS-employed field manager inspected the pigs, counted the pigs, and documented any conformance issues requiring less-than-full pay. If the JBS count was lower than Garner's initial count, the difference between those two numbers was referred to as "ghost pigs." Conformance issues and "ghost pigs" were noted on a Batch Farrowing Request for Final Payment that Garner received after every batch of pigs had been shipped to JBS.

Garner brings to the Court's attention a July 2021 Batch Farrowing Request for Final Payment noting that he reported 1,053 pigs loaded onto the truck, but he was only credited for the

8

shipment of 990 pigs. ECF No. 28-2. This document also notes that 40 pigs were "docked" for being lame or "unthrifty."[2] Garner asserts that each Batch Farrowing Request for Final Payment demonstrated "a clear breach of JBS' obligation to pay Garner for the [pigs] that were 'transferred' from his [F]arm." ECF No. 28, at 7. This argument is somewhat confusing as the Agreement did not obligate JBS to pay for every pig transferred from Garner's Farm. JBS was only obligated to pay for pigs received at a JBS facility that complied with the weaned pig specifications.

It appears that Garner is arguing that his initial counts of the pigs at his Farm were correct while JBS's counts at the final destination were incorrect. In other words, he takes issue with the number of "ghost pigs" documented on some Batch Furrowing Requests for Final Payment. However, Garner has offered no evidence to prove that his counts were correct while JBS's counts were incorrect. Garner summarily states in his declaration that "on almost every instance," JBS's count at the facility was less than Garner's count at the Farm. ECF No. 28-5, at 3-4. However, Garner has not presented any evidence to back up his conclusory allegation that JBS's count was almost always incorrect. Thus, this allegation is simply speculation and conjecture that fails to create a significant and genuine issue of material fact that defeats JBS's motion for summary judgment.

In sum, Garner has not provided any evidence that supports his argument that JBS "routinely and systematically failed to pay [him] for the pigs that were 'transferred' from his Farm." ECF No. 28, at 6. Accordingly, the Court finds that JBS is entitled to summary judgment on this claim.

---

[2]This document, ECF No. 28-2, is somewhat difficult to read. The Court can make out some of the numbers on the document but will assume Garner's description of the document as true for purposes of deciding the summary judgment motion.

9

### 4. Termination of the Agreement

In response to JBS's summary judgment motion, Garner claims that JBS breached the Agreement when it unilaterally terminated the Agreement before the five-year term expired. Garner claims that JBS's given reason for terminating the Agreement, animal welfare issue, was false. Garner asserts that there were no animal welfare issues that would justify the termination of the contract.

JBS argues that wrongful termination of the contract is a new theory of liability Garner raised for the first time in his response to the summary judgment motion. JBS argues that this theory was not sufficiently alleged or even suggested in the complaint, and thus it had no notice of this theory of liability for breach of contract. *See Adams v. Am. Family Mut. Ins.*, 813 F.3d 1151, 1154 (8th Cir. 2016) ("A theory of liability that is not alleged or even suggested in the complaint would not put a defendant on fair notice and should be dismissed.") (citation omitted).

Garner's complaint states that "JBS has never provided Garner with any credible basis for its unilateral cancelation of the contract." ECF No. 3, at ¶ 65 (mistakenly identified as ¶ 66). The complaint also states that "JBS did not identify any alleged, material problems" with the Farm and that JBS's "unilateral cancellation of the contract placed Garner in dire financial condition." ECF No. 3, at ¶ 56, 58. The Court finds that the complaint provides JBS with fair notice that one theory of liability for the breach of contract claim is that JBS terminated the Agreement without a legitimate basis to do so. Because JBS has not moved for summary judgment on the wrongful termination claim, this claim remains for trial.[3]

---

[3] JBS also argues that the Court should disregard Garner's argument that JBS breached the implied covenant of good faith and fair dealing because he is raising this clam for the first time in his summary judgment response. It is unclear whether Garner is attempting to raise this as a claim in his response, but the Court agrees with JBS that this is not a claim Garner made in his complaint. Thus, the Court will not consider any clam that JBS breached the implied covenant of good faith and fair dealing.

### B. Promissory Estoppel

Garner claims that because he relied on JBS's representations that it would contract with him and pay him for animals for five years, JBS "should be estopped from unilaterally canceling the [Agreement] and failing to pay him for the animals he produced." ECF No. 3, at ¶¶ 80, 83.

To prove promissory estoppel, a plaintiff must show:

> (1) the defendant made a promise; (2) the defendant should have reasonably expected the plaintiff to act or refrain from acting in reliance on the promise; (3) the plaintiff acted or refrained from acting in reasonable reliance on that promise to its detriment; and (4) injustice can be avoided only by enforcement of the promise.

*Holmes v. Potter*, 502 S.W.3d 397, 403 (Ark. App. 2017). "Promissory estoppel may be a basis for recovery only when formal contractual elements do not exist." *Taylor v. George*, 212 S.W.3d 17, 25 (Ark. App. 2005).

Garner argues that he "relied on JBS' representations that it would contract with him and pay him for animals over a term of years. Based on that reliance, he borrowed money and purchased the [F]arm." ECF No. 3, at ¶ 80. However, this claim must fail because JBS fulfilled this promise to contract with Garner. In March 2018, JBS entered into the Agreement with Garner wherein JBS promised to pay Garner for pigs over a term of five years. The term of the Agreement, however, was subject to JBS's termination rights. JBS claims that Garner defaulted on numerous material obligations, and thus it was exercising its termination rights when it chose to terminate the Agreement. Further, because the parties executed the Agreement and it expressly addressed payment and the five-year term, promissory estoppel cannot be a basis for recovery. *See Glenn Mech., Inc. v. South Ark. Reg. Health Ctr., Inc.*, 278 S.W.3d 583, 586-87 (Ark. App. 2008) (ruling that promissory estoppel claim failed as a matter of law where an enforceable written contract addressed the same subject matter). Accordingly, the Court finds that JBS is entitled to summary

judgment on this claim.

### C. Tortious Interference with a Contract

Garner claims that, after JBS terminated the Agreement, it "actively discouraged anyone from buying the [Farm] and actively interfered with Garner's attempts to sell it." ECF No. 3, at ¶ 72. In support of this claim, Garner alleges the following: (1) prospective purchasers contacted JBS to inquire about whether JBS would provide them a contract if they purchased the Farm; (2) JBS told some prospective purchasers that it would not provide a contract; and (3) JBS told at least one person that it was not interested in contracting with anyone who purchased Garner's Farm because the Farm was out-of-date and it would be cost prohibitive to ship animals from JBS's other facilities. ECF No. 3, at ¶¶ 69-71.

A tortious interference with a contract claim is based on a defendant's wrongful interference with the plaintiff's contractual or business expectancies with a third party. *Navorro-Monza v. Hughes*, 763 S.W.2d 635, 636 (Ark. 1989). To prove his claim of tortious interference with a contract, Garner must prove: (1) the existence of a valid and enforceable contract or business expectancy; (2) JBS's knowledge of the contract or business expectancy; (3) JBS's intentional interference with the contract or expectancy; and (4) damages suffered by Garner as a result of JBS's interference. *Skalla v. Canepari*, 430 S.W.3d 72, 80-81 (Ark. 2013). Further, the first element requires some precise business expectancy or contractual relationship. *Id.* As to the third element, JBS's conduct must have been "improper." *Id.*

JBS argues that Garner's tortious interference claim must fail because there was no valid contract or business expectancy. The Court notes that Garner does not address this element of his tortious interference claim. There is no evidence that Garner had an agreement in place regarding the sale of the Farm or that he even discussed a specific sale price with any interested party. Garner

states that he was "trying to sell his Farm," but this hope or belief that he could sell the Farm is not a "sufficiently concrete business expectancy to survive summary judgment." *Id.* at 81. (holding that a "proposed plan," consisting of a written plan and preliminary estimate, to make improvements to a farm "did not qualify as a sufficiently concrete business expectancy to survive summary judgment "). Garner does not identify any precise business expectancy or contractual relationship regarding the sale of his Farm. Further, the Court finds no evidence in the record that shows the existence of a valid enforceable contract or business expectancy as required by Arkansas law to prevail on a tortious interference claim.

JBS argues that another reason Garner's tortious interference claim must fail is because there is no evidence to show that JBS intentionally interfered with the contract or business expectancy or that its conduct was improper. Arkansas courts consider several factors when determining whether a defendant's conduct was improper. *Mason v. Wal-Mart Stores, Inc.*, 969 S.W.2d 160, 164 (Ark. 1998). These factors include: (1) the nature of the defendant's conduct; (2) the defendant's motive; (3) the plaintiff's interests that were interfered with; (4) the interests advanced by the defendant; (5) the social interest in protecting the defendant's freedom and plaintiff's contractual interests; (6) the proximity of the defendant's conduct to the interference; and (7) the relations between the parties. *Id.*

Once JBS terminated the Agreement, it does not appear that JBS had any interest in Garner's Farm. There is no evidence in the record that JBS intentionally or proactively contacted anyone interested in purchasing the Farm. JBS never initiated contact with any potential purchasers. The communications between JBS and potential buyers were limited to questions of whether JBS would offer a new sow production agreement to a purchaser of Garner's Farm. JBS states that it answered these inquiries honestly, explaining that such an agreement was unlikely.

Garner offers no evidence in support of his argument that JBS was motivated by a desire to punish Garner when it answered these inquiries. Accordingly, the Court finds that JBS is entitled to summary judgment on Garner's tortious interference claim.

### D. Conversion

"[C]onversion is a common-law tort action for the wrongful possession of or disposition of another's property." *Integrated Direct Mktg., LLC v. May*, 495 S.W.3d 73, 75 (Ark. 2016). Garner's conversion claim is based on his allegation that "JBS took all the pigs from his [Farm] without properly compensating him." ECF No. 3, at ¶ 102. To establish liability for the tort of conversion, Garner must prove that JBS wrongfully committed a distinct act of dominion over his property, which is a denial or defiance of or is consistent with his rights as owner. *See Hatchell v. Wren*, 211 S.W.3d 516, 521 (Ark. 2005).

The problem with Garner's conversion claim is that the pigs are not his property. All pigs on the Farm were the lawful property of JBS. The Agreement states that "[a]ll of the pigs and Breeding Stock covered by this Agreement and any proceeds from the sale thereof are, and shall at all times remain, the sole property of [JBS]." ECF No. 27-2, at § II(9). Even Garner admitted that all the pigs on his Farm were the lawful property of JBS. ECF No. 27-3, at 24. There is no dispute that JBS owned the pigs it took from Garner's Farm. Accordingly, the Court finds that JBS is entitled to summary judgment on this claim.

### V. CONCLUSION

For the reasons stated above, the Court finds that JBS's Motion for Summary Judgment (ECF No. 27) should be and hereby is **GRANTED IN PART and DENIED IN PART**. Garner's breach of contract claim based on his allegation that JBS failed to pay him for the pigs that were transferred from his Farm is **DISMISSED**. Likewise, Garner's claims for promissory estoppel,

tortious interference with a contract, and conversion are **DISMISSED**. Garner's breach of contract claim based on his allegations that JBS failed to provide an appropriate number of gilts and sows, failed to provide replacement breeding stock, and wrongfully terminated the Agreement remain for trial.

    **IT IS SO ORDERED**, this 30th day of June, 2023.

                                        /s/ Susan O. Hickey
                                        Susan O. Hickey
                                        Chief United States District Judge